UNITED STATES of America

v.

Buford BRELAND, Roy Efrom Lance, Joseph Jeff McCranie, Robert Daniel Williams.

UNITED STATES of America

v.

Eugene P. BYRD, Janie P. Byrd.

UNITED STATES of America

v.

James Frederick JONES.

UNITED STATES of America

v.

Scotty R. ROSETTI.

UNITED STATES of America

v.

James E. WALLS.

UNITED STATES of America

v.

John Timothy ARMSTRONG.

UNITED STATES of America

v.

John Morris BRINDLE.

UNITED STATES of America

v.

Gary P. WORLEY.

UNITED STATES of America

v.

Louis HARVEY.

UNITED STATES of America

v.

Alfers L. ALLEN.

UNITED STATES of America

v.

Charles E. THOMAS.

UNITED STATES of America

v.

Donald MARTIN.

UNITED STATES of America

v.

Jerry MELTON.

UNITED STATES of America

v.

Jerry MELTON.

UNITED STATES of America

v.

Frank NAPOLITANO.

Crim. A. Nos. 79–129A, 17–154A, 81–02G, 80–05A, 81–06A, 81–11A, 81–15R, 81–23R, 81–29A, 81–62A, 81–98A, 81–146A, 80–151A, 80–152A and 81–153A.

United States District Court, N. D. Georgia, Atlanta Division.

Sept. 10, 1981.

Janet F. King, Asst. U. S. Atty., Atlanta, Ga., for the United States.

John R. Martin, Robert Altman, John L. Taylor, Jr., Stanley H. Nylen, Alan L. Dye, Mose S. Hayes, Jr., Hirsch Friedman, Theodore S. Worozbyt, Michael McIntyre, Al Horn, Edward E. Augustine, Beverly Bates, Jerry Rylee, Michael E. Kessler, George E. Duncan, Jr., William Adell Wehunt, Clayton Sinclair, Robert Hishon, Stephanie Kearns, Joe Salem, Jay Strongwater, Atlanta, Ga., H. Lee Bauman, Coconut Grove, Fla., Michael Parham, East Point, Ga., Bobby Lee Cook, Sr., Summerville, Ga., Robert B. Thompson, Gainesville, Ga., Anthony Solari, Marietta, Ga., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge, Sitting by Designation.

In this consolidated hearing, the court is presented with the common question raised by all defendants that the indictments returned against them should be dismissed because of alleged unconstitutional underrepresentation in the selection of grand jury forepersons by the District Judges of the Northern District of Georgia. This issue was reserved in our former consolidated hearing, *United States v. Northside Realty Associates, Inc.*, 510 F.Supp. 668 (N.D.Ga. 1981), in which the court dismissed 34 indictments because of substantial noncompliance with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. and the District's Local Plan.[1]

Unlike the defendants in *Northside Realty*, the present defendants' constitutional claims based on foreperson selection are ripe for decision. The record on the foreperson issue created in the *Northside Realty* case was adopted by all parties, who appeared on August 10, 1981, to update the record by the submission of additional exhibits and to offer limited testimony. We hereby make findings of fact and conclusions of law based on the record now before us.

## I. EVIDENCE

(a) *Composition by Race and Sex of Grand Juries, Forepersons and Deputy Forepersons.*

From January 1970 to February 3, 1981, 47 different grand juries for the Northern District of Georgia were impaneled, each consisting of not more than 23 members. During this period, 48 foreperson and 47 deputy appointments were made.[2] The duty of appointing forepersons and deputies was rotated among 11 then sitting judges.[3]

---

1. The government has appealed this ruling.

2. The death of the original foreperson of the grand jury impaneled January 7, 1976, caused the appointment of a successor foreperson since the deputy of that grand jury withdrew her name from consideration as succeeding foreperson.

3. Judge Edenfield impaneled 7 grand juries; Judge Moye 11; Judge Freeman 10; Judge

Of the 48 forepersons selected, three were black.[4] Two white females were selected foreperson by Judge Freeman. Regarding deputies, there were three black females, two black males, and 14 white females.[5]

All grand juries aggregated 1060 jurors, composed of 563 (53.1%) white males, 336 (31.7%) white females, 74 (7.0%) black females, and 58 (5.5%) black males.[6] As regards the composition by sex, 637 (60.1%) were males and 423 (40.0%) were females. As for race, 899 (84.8%) were white and 132 (12.5%) were black.[7]

(b) *Population Data.*

Census data for 1980 indicates that the racial composition of the Northern District of Georgia is 78.4% white and 20.6% black. Because 1980 census data broken down by age was not yet available and because the foreperson selections at issue were made from 1970 to 1980, we deem it appropriate to utilize the 1970 data, adjusted by 1978 Georgia estimates and recognized undercount percentages, relied upon by James Michael O'Reilly, defendant's expert, at the January hearing. Applying these formulas, the Northern District of Georgia's jury age-eligible (18 to 69)[8] black population of 340,-464 represents 19.1% of the total age-eligible population. Since black forepersons represented only 6.1% of total foreperson selections, the absolute disparity is 13%.[9] Although O'Reilly's testimony did not include statistical data concerning deputy fo-

O'Kelley 5; Judge Hooper 7; Judge Hill 2; Judge Shoob 1, Judge Vining 1; Judge Tidwell 1; Judge Evans 1; and Judge Hall 1.

4. All three black forepersons were male. Judges Moye and Hall each appointed one; the other was originally appointed by Judge Edenfield as deputy, but he later assumed the duties of foreperson by agreement between himself and the appointed foreperson with Judge Edenfield's approval.

5. Judges Edenfield and Evans each appointed one black male deputy foreperson; Judge Freeman appointed one black and four white females; Judge Moye appointed two black and four white females; Judge Hooper appointed three white females; and Judges Shoob, Vining and Hall each appointed one white female.

6. The race of 16 males and 13 females could not be determined.

7. See Jt. Ex. 124 to 165, Gov't Ex. 1 to 42 and B–F; and Deft. Ex. S–1 to S–5. In case of conflicts between government exhibits and questionnaires in Jt. Ex. 124 to 165 and Deft. Ex. S–1 to S–5, we relied upon the original source material. When available, "race and sex" reports prepared by the clerk's office and found in certain joint exhibits were relied upon. When not affirmatively indicated, gender assumptions were made, when reasonable to do so, based on the individual's name.

8. O'Reilly considered only persons age 18 to 69 since persons over the age of 70 may be excused from service on request.

9. Updated statistical evidence utilized the comparative disparity and chi square (X²) analyses. Comparative disparity is determined by dividing the absolute disparity by the percent- age of the group in the population. Thus, while the absolute disparity of black grand jury forepersons compared to the jury-eligible black population is only 13%, the comparative disparity is 68.1%, indicating an underrepresentation of 68.1%. The X² method is used to determine the likelihood of achieving the actual distribution by chance. If grand jury forepersons were selected at random, the odds of so few blacks serving as foreperson would be approximately 1 in 50.

Dr. O'Reilly was of the opinion that the comparative disparity analysis was most helpful in cases such as this because it measures the actual deviation against what would be expected if everyone had an equal opportunity to serve. Tr. 488–89. Other authorities have also recommended that comparative disparity be used in jury discrimination cases. *See* Gewin, An Analysis of Jury Section Decision Selection Decisions (reprinted as appendix to *Foster v. Sparks*, 506 F.2d 805 at 834–35 (5 Cir. 1975); Kairys, Kadane & Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Calif.L. 776, 793–99 (1977). The Fifth Circuit has recently declined to apply either the comparative disparity or the X² method in a jury discrimination case. *United States v. Maskeny*, 609 F.2d 183, 190 (5 Cir. 1980). Although we recognize that the comparative disparity method might be useful in other cases, we see no reason to adopt it here.

Furthermore, X² is not appropriate in the case sub judice. Dr. O'Reilly recognized that use of X² is "problematic" when one deals with entire populations instead of mere samples. Tr. at 485–86. More important, since grand jury forepersons are not in fact selected randomly, the fact that more blacks would serve as foreperson if that position was so selected is immaterial. *See United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1128 (5 Cir. 1981) (en banc).

repersons, our analysis indicates that black forepersons and deputy forepersons represented 8.4% of total foreperson and deputy appointments (8 out of 95). Thus, if the positions of foreperson and deputy are considered of equal significance, the absolute disparity is reduced to 10.7%.

Females comprise 51.2% of the district age-eligible population. Since there were only two female forepersons, representing 4.1% of total foreperson selections, the absolute disparity regarding females is 47.1%.[10] Females were appointed as either foreperson or deputy foreperson a total of 19 of the 95 total foreperson and deputy selections. Therefore, a comparison of 20% female representation of total foreperson and deputy appointments with their proportion in the population results in an absolute disparity of 31.2%.

### (c) Theoretical Evidence.

Dr. John McConahay, an expert in group dynamics, testified that since the grand jury foreperson is selected by a judge, who is perceived as a neutral person with authority and expertise in the law, the appointee would have more influence during deliberations than the average grand juror. McConahay, however, acknowledged that he had no actual knowledge of or experience with a federal grand jury, having never served as a grand juror, and thus did not know the nature or length of duty or the manner in which a grand jury transacts business. Professor Hans Zeisel, author of *The American Jury*, testified concerning his studies regarding the role of the foreperson in petit juries. Since no one has ever studied the deliberations of a grand jury, Zeisel was of the opinion that petit jury studies constituted the best information available. Zeisel's studies indicate that a petit jury foreperson's contribution during deliberations represented 25% of total contribution by petit jurors, and that the remaining 11 petit jurors contributed 75%. Furthermore,

the foreperson's initial feelings concerning a case coincided with the jury's ultimate finding in more cases than did the initial feelings of other jurors. Although petit jurors normally select their own foreperson, Zeisel concluded that the influence of a foreperson would be increased if appointed by a judge. Zeisel agreed with McConahay that the leader of any group becomes more important as the size of the group increases.

Judge Robert L. Vining, Jr., testified that, based on his personal observations of 40 state grand juries while he was district attorney in the Georgia state courts, the foreperson occupies a "vital position"—"[o]therwise you've got twenty-three people running off in twenty-three different directions." Tr. 307. Judge Vining described desirable qualities in a foreperson as follows:

> [H]e or she has to be a person who basically can operate, run a business, a board, so as to speak, of a business, with some degree of firmness, not be arbitrary. I think a foreman has to be a strong person in that it is—the grand jury is dealing with the government and, after all, the grand jury is the only thing that stands between a defendant and trial.

Tr. 306. The judge readily acknowledged that the state grand jury operates in several respects different from a federal grand jury. For example, in Georgia the state grand jury foreperson is selected by the grand jurors and does not ordinarily cast a vote in indictments.

### (d) Judges' Testimony.

With one exception, the testimony of all judges involved in the selection of forepersons and deputies during the relevant period was offered by the government. The judges generally relied solely on information provided in the juror questionnaires and made no independent investigation of the qualifications of persons drawn as grand jurors. Several judges also con-

**10.** Comparative disparity analysis results in 92.0%, while use of $X^2$ indicates that, if forepersons were selected randomly, the odds of so few female selections would be approximately one in a billion.

sidered a person's appearance and speaking voice in the courtroom before making the selections. All judges emphatically stated that a person's race or sex was not considered as a negative factor and that they did not discuss their selection criteria with each other. Except on rare occasions, the appointing judge did not know, personally or by reputation, jurors who were chosen foreperson or deputy. There was no evidence that the clerk's office or United States Attorney's office at any time made suggestions in this regard. Since the factors which each judge considered during the selection process are individualized, their testimony should be separately summarized.

Judge Richard C. Freeman, a ten-year veteran on the bench, was interested first in a person's education and next in the job position. Tr. 1617–18. His reasoning was as follows:

I think that the person who functions as the grand jury foreperson needs to have some sort of ability to lead and to make decisions, and I think the more education a person has—and that doesn't make him any brighter than anybody else, doesn't make him any more intelligent, but it means that he has pursued a course in life that perhaps might equip him better, or her better, to do a particular function such as this.

In the absence of any outstanding educational background, I would then look to present job position.

Tr. 1618. The same criteria were used for selecting the deputy. The judge made his selections from the questionnaires before impaneling the grand jury. Regarding one's job experience, Judge Freeman stated that he "looked principally for one who was in a position or had a position where he was called upon to make decisions, where he dealt with people and worked with people" since he thought that a foreperson, in scheduling jury sessions and passing on members' excuses, should be "somebody who is pretty firm and who won't be manipulated by others." Tr. 1624. Judge Freeman stated that he tried to balance the race and sex of foreperson and deputy appoint-

ments, provided they satisfied his two standards, Tr. 1630–33. Judge Freeman also took into account the residence of the appointees since he "felt that Atlanta should not always control over the position of foreperson, deputy foreperson, and that the other divisions [Gainesville, Rome and Newnan] should have a crack at it." Tr. 1636. Judge Freeman assessed the position of foreperson as follows:

I really think ... that most anybody is qualified who gets on the grand jury panel, really, to serve. There are just some who perhaps it's easier for them to make decisions. And the kind of decisions they make are not: Do we indict Joe Blow or do we not indict Joe Blow? The kind of decision the foreperson or deputy foreperson might be called upon to make are those administrative decisions: Do I excuse Mary Jones or do I excuse Sam Smith or not? So I just really don't think that the position of deputy foreperson or foreperson, actually, is really that critical.

Tr. 1641–42.

Judge James Hill, presently a member of the Fifth Circuit Court of Appeals, testified concerning his two-year experience as a district judge appointing forepersons and deputies. Judge Hill envisioned the foreperson "as being someone who would preside over a group of people, would probably have to deal with the United States Attorney when they were saying when they wanted to come back in session, and kind of do a little administrative work and kind of preside over a meeting." Tr. 1260. Judge Hill considered "age, probably maybe some interest in education, though [he] doubt[ed] it's a job that would take a vast amount of education, and experience." Tr. 1261. Judge Hill's practice was to ask prospective forepersons and deputies whether they were willing to serve in the position; unless they were agreeable, he would ask someone else. Tr. 1261–62. He also would not appoint as foreperson a member who had asked to be excused. Tr. 1263. Judge Hill acknowledged that "anybody called to serve on the grand jury could probably do the job of chairman of the meetings or succeeding to that in the absence of the chairman," Tr.

1276, and that "if you shut down court for a day and took these people individually and did a good deal of examining of them to find out who might be the best-chosen person, you might come up with different people in all of these [selections]." Tr. 1273. Stating that he never considered race or sex in going through questionnaires "to finger two people to serve," Judge Hill was not cognizant of the fact that the juror questionnaires disclosed a person's race and sex until he was shown them on the witness stand. Tr. 1284.

Judge Newell Edenfield, for 14 years a member of the court, considered each questionnaire, making several tentative choices before reaching a final decision. He was concerned with the education and employment of the grand jurors in selecting forepersons and deputies. Tr. 1652 and 1655. Age was also a factor, since he did not ordinarily appoint someone of extreme old age or extreme youth, but was seeking "level headed" persons. Tr. 1653. Judge Edenfield stated that he would be a "little suspicious" of appointing as foreperson someone who indicated as employment "housewife" even if she was educationally qualified "[b]ecause [he] wouldn't think [such person] would have the necessary knowledge of the dealings in the community dealing with the various problems that come up in the business world, the commercial world, social world. That is, it's not likely they would." Tr. 1672. The judge acknowledged that in making all-male appointments he may have wished to "spare" females from assuming foreperson duties by stating:

> Every person is a product of his background, heredity and environment. In the background and environment in which I was raised, I know many, many, many women who would not want to be appointed grand jury foreperson. They would consider it a disaster. In the environment and the heredity in which I was raised, you tried to shield women from things that they didn't want.
>
> Who is to say whether some element of shielding somebody from something that I thought might be distasteful to them or which though not beyond this capabilities,

they thought was beyond their capabilities, which would harass them and worry them every minute as to whether they were going to do the right thing or make some mistake or—there may have been that element involved in it. I'm not conscious of it, but I recognize the possibility. Tr. 1681.

Judge William C. O'Kelley, a district judge since 1970, first reviewed every juror questionnaire to look for education and employment. He then observed prospective grand jurors in the courtroom as they were identified and answered the roll call to determine "whether they were forceful," and he chose "a person who [he] considered to be a good presiding officer." Tr. 1333–34. He thought the foreperson and deputy should have "a substantial educational background and . . . employment background that [indicated] some managerial ability." Tr. 1334. Judge O'Kelley stressed that he usually had several possible choices in mind and made his final decision after hearing them respond. On cross-examination, the judge expressed the view that a "good presiding officer" was one "who can handle . . . and control people and control meetings, maintain order." Tr. 1346.

Chief Judge Charles A. Moye, Jr., similarly considered the education and experience of prospective grand jurors in selecting forepersons and deputies. Tr. 1397. He attempted to select as foreperson "the person that appeared . . . strongest in administrative or leadership ability. And the deputy would . . . be the second person." *Id.* It was Judge Moye's practice to tentatively select four names from the list before entering the courtroom and then make final decision after acting upon requests for excuse. Tr. 1398.

Judge Robert L. Vining, Jr., recalled by the government, considered business experience as well as education basic criteria for choosing forepersons and deputies. Tr. 1455. For the one federal grand jury which Judge Vining impaneled, he initially decided to appoint a female as foreperson but changed his selection when the individual

indicated she would not be able to attend all grand jury sessions. Judge Vining thereupon chose another as foreperson and the female as deputy. Tr. 1456, 1460.

Judge Marvin H. Shoob, in his third year on the federal bench, described the selection process he utilized in appointing a foreperson and deputy as follows:

[I]n going through the forms, I promptly eliminated maybe seventy percent of them who were obviously not qualified for grand jury foreperson. I was looking for someone with experience in dealing with people, preferably with business experience. That narrowed it down even more, and I wanted someone who was well educated, preferably with a college education, so that narrowed it down to three or four. And I selected one from that smaller group.

Tr. 1476. Judge Shoob stated that he made his final decision for appointments before entering the courtroom, and that "[i]f all things were equal, [he] would have selected a woman as foreperson." Tr. 1477–78. The judge, who had named females as forepersons, stated that he would have selected a female or black as foreperson or deputy if such an individual had the same qualifications as a white male. Tr. 1489.

Senior Judge Frank A. Hooper testified by deposition that he considered a person's employment and education in selecting a foreperson and deputy. Gov't Ex. 201 at 4–5. Judge Hooper was not aware that there was "anything on these [questionnaire] forms . . . that asks about the color [or] ethnic origin." *Id.* at 5.

Judge Orinda Evans, who took office in August 1979, testified by deposition. Regarding her single grand jury impanelment in December 1980, Judge Evans asked each prospective grand juror to state his or her name, address and occupation. Gov't Ex. G at 4. She considered the individual's job and whether the person would be articulate in making her selections, as she envisioned the position to call for "someone who will take a responsibility for running the meeting, someone who would sort of get things started." *Id.* at 5. Judge Evans thought

that persons in management-type positions would best qualify for the foreperson and deputy positions, since these people would more likely have experience in running a meeting. *Id.* at 12. She also wanted someone "who had more rather than less education." *Id.* at 16.

## II. LEGAL ANALYSIS

### (a) *What Amendments Apply?*

Defendants maintain that the substantial underrepresentation of blacks and females as forepersons violated their constitutional rights under the fifth and sixth amendments. Although we believe a prima facie case of discrimination under the fifth amendment was established, we hold that defendants have not carried their burden under the sixth amendment.

The sixth amendment requires that jurors be selected from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527–31, 95 S.Ct. 692, 696–98, 42 L.Ed.2d 690, 696–98 (1975). Only one court has seen fit to extend the "fair cross section" requirement regarding juror selection to the appointment of forepersons. In *United States v. Holman*, 510 F.Supp. 1175 (N.D.Fla.1981), Judge Hatchett, sitting by designation, held that defendants had established a prima facie case under both the fifth and sixth amendments. *Id.* at 1180. The judge did not discuss his reasons for finding the sixth amendment applicable to foreperson selections even though he had previously held in another case that the fair cross section requirement was not violated by the fact that blacks and females were underrepresented in foreperson appointments. In *United States v. Jenison*, 485 F.Supp. 655 (S.D.Fla.1979) (Hatchett, J., sitting by designation), the court stated as follows:

Absent a showing that the impact of the grand jury foreperson is so substantial as to influence or alter the unique qualities and characters of the jury's individual members, a defendant's right to a fair cross-section is not denied where identifiable groups are underrepresented in the position of foreperson.

*Id.* at 661–62. This rationale has been adopted by several other courts. *See United States v. Manbeck*, 514 F.Supp. 141, 147 (D.C.C.1981); *United States v. Cross*, 516 F.Supp. 700 at 705 (M.D.Ga.1981); *United States v. Layton*, 519 F.Supp. 946 (N.D.Cal. 1981). As Judge Peckham noted in *Layton* :

> [A]bsent a strong showing that the impact of the grand jury foreperson is "so substantial as to influence or alter the unique qualities and characters of the jury's individual members," a defendant's sixth amendment right to a grand jury representing a cross section of the community is not violated even by purposeful discrimination in the selection of a foreperson. The office of foreperson involves purely ministerial functions which do not jeopardize the "diffused impartiality" sought to be attained from a fair cross section.

*Layton, supra,* at 957 (quoting *Jenison, supra* ).

We agree with this analysis and hold that defendants have not made the requisite showing. Judge Vining's testimony regarding the importance of the foreperson in the Georgia state courts carries little weight since he, of course, could not know what influence, if any, a federal grand jury foreperson would have during deliberations. Neither of defendants' experts on this issue had any actual experience with a federal grand jury. McConahay, who opined the foreperson would have more than average influence during deliberations, readily conceded that a foreperson who did not in fact lead discussions during deliberations would have "very little influence on the outcome of the deliberations." Tr. 1584. McConahay also acknowledged that it was "quite possible" that natural leaders would emerge from the grand jury who would have far more influence over a period of time than the appointed foreperson. Tr. 1598. Zeisel admitted that grand juries differed from petit juries which he had studied. Since, for example, as Zeisel acknowledged, there is not as much dissent in grand juries as in petit juries, there is less opportunity for influence by a single juror in a grand jury setting as there is when a petit jury deliberates.

Notwithstanding the expert testimony, it is highly unlikely in our mind that an individual could possess dominion over others simply because he was appointed as grand jury foreperson. Rather, it appears more reasonable that strong and forceful persons will naturally have influence over the less assertive regardless of which individual is foreperson. We are not persuaded by the record that a contrary conclusion would be based upon substantial fact. For these and other reasons, we find that defendants' experts' opinions regarding increased influence of a foreperson did not rise to such a level as to convince us that the foreperson's impact "is so substantial as to influence or alter the unique qualities and character of the jury's individual members," and that defendants have failed to establish a prima facie case under the sixth amendment.

The fifth amendment claim, however, requires separate consideration. In *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Supreme Court, in an opinion primarily reaffirming earlier decisions holding that discrimination in grand juror selections is a valid ground for setting aside a conviction, "assume[d] without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the entire grand jury venire." *Id.* at 551 n.4, 99 S.Ct. at 2998 n.4, 61 L.Ed.2d at 747 n.4. Under Tennessee law, the grand jury foreperson was selected from the general population, and not the grand jury, by the trial judge for a term of two years. Although the Court held that a prima facie case of foreperson discrimination had not been proved, its assumption regarding the constitutional significance of the foreperson has prompted a great deal of litigation. The Fifth Circuit has twice assumed, in habeas corpus cases arising from state convictions, "that the right to a grand jury selected without regard to race applies fully when only the selection of the foreperson is at issue rather than the selection of

the entire grand jury." *Williams v. State of Mississippi*, 608 F.2d 1021, 1022 (5 Cir. 1979), *cert. denied*, 449 U.S. 804, 101 S.Ct. 49, 66 L.Ed.2d 8 (1980); *Guice v. Fortenberry*, 633 F.2d 699, 703 n.6 (5 Cir. 1980), *reh. en banc granted*, 642 F.2d 98 (5 Cir. 1981).

Federal district courts have gone even further than the Supreme Court and the Fifth Circuit to hold that the position of federal grand jury foreperson is in fact constitutionally significant. The first case to so hold was *Jenison, supra*, wherein Judge Hatchett stated his conclusion that *Rose* definitively decided the constitutional significance of the grand jury foreperson. *Jenison* was relied upon in *Holman* and *Manbeck, supra*, for the proposition that an equal protection challenge under the fifth amendment may be based upon discrimination in the selection of foreperson of a federal grand jury. To our knowledge, there are only two cases which hold that the position of grand jury foreperson carries no constitutional significance.

In *Hale v. Henderson*, 349 F.Supp. 567, 569 (W.D.Tenn.1972), *aff'd* 485 F.2d 266 (6 Cir. 1973), *cert. denied*, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974), a Tennessee state inmate filed a petition for writ of habeas corpus on the ground that no blacks were selected as foreperson in 150 Tennessee grand jury foreperson appointments. In petitioner's grand jury, the foreperson was selected by the trial judge from 13 grand jury members, who were randomly selected from the jury venire. The district court declined to dismiss the indictment, noting:

> The court does not believe that the fact that [the appointing judge] exercised his discretion in appointing a member of the grand jury body to act as foreman ... is significant where the members he chose from were all randomly selected. That [the appointing judge] had the authority to select, in whatever manner he saw fit, the man whom he thought could best discharge the duties of foreman, was not discriminatory where the body from which the selection was made had been randomly created. Moreover, the fact

that [the appointing judge] could have gone outside of the grand jury body to select a foreman ... is not significant where, as in this particular case, he did not.

349 F.Supp. at 569. On appeal, the Sixth Circuit affirmed, noting that "[p]roportional representation is not required either in grand juries or in the appointment of grand jury foremen." 485 F.2d at 270.

*Henderson*, of course, was decided prior to *Rose*, which also came from the Sixth Circuit Court of Appeals, *Mitchell v. Rose*, 570 F.2d 129. In *Rose*, however, the Sixth Circuit explicitly held that a case of grand jury foreperson discrimination had been shown by the fact that no black had ever been appointed foreperson. Unlike *Henderson*, however, in *Rose* the foreperson was selected not from among the grand jury but from the general population. The Sixth Circuit in *Rose* stated that it felt that *Henderson* was not contrary to its holding. In addition to the fact that the Tennessee foreperson exercised important functions, the Sixth Circuit in *Rose* based its decision on the fact that "the foreman or forewoman is a full member of the grand jury and ... a grand jury which is only twelve-thirteenths constitutional cannot render constitutionally valid indictment." 570 F.2d at 136.

A recent decision is *Cross, supra*, wherein the court in the Middle District of Georgia held as follows:

> [I]t is the opinion of this court that no constitutional significance attaches to the position of foreman or deputy foreman of a federal grand jury. A criminal defendant has no constitutional right to a grand jury panel of a particular composition or a constitutional right to a Supreme Court Justice, a United States Circuit Judge, or United States District Judge of a particular race or sex. Accordingly, the court holds that the appointment by a district judge under Rule 6(c), Federal Rules of Criminal Procedure, of a foreman or deputy foreman in a federal grand jury drawn from a source constitutionally and statutorily composed, and thus representing a fair cross-section of the community,

is not subject to constitutional attack on grounds of discrimination.

*Id.* at 705.

Despite the appeal of *Henderson* and *Cross*, and although the Fifth Circuit has never explicitly discussed the question of whether grand jury foreperson discrimination can be claimed by an accused when the foreperson was selected from a grand jury which was itself selected from a randomly drawn and representative venire, we are nonetheless mindful that, as a district court, our function is to find the facts, and not unnecessarily create or expand the law beyond settled principles. Since the Supreme Court and the Fifth Circuit have each assumed that a grand jury foreperson in state courts occupies a constitutionally significant position, we shall make the same assumption with regard to the federal grand jury foreperson.

(b) *Which Defendants Have Standing?*

■ The government argues that even if the position of foreperson is constitutionally significant, only black defendants may challenge foreperson discrimination on the basis of race and only females may challenge such discrimination on the basis of sex.[11] The government maintains that the standing requirement is evident from the Supreme Court's language in *Rose* that "in order to show an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial under-representation *of his race or of the identifiable group to which he belongs.*" 443 U.S. at 565, 99 S.Ct. at 3005, 61 L.Ed.2d at 755 (brackets in original; emphasis added) (quoting *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Similar language was used by the Fifth Circuit in *Guice, supra,* at 703–04. Based on *Rose* and *Guice,* the courts in *Layton* and *Cross* held that white males did not have standing to challenge, on equal protection grounds, alleged discrimination in foreperson selection.

Defendants argue that, in light of *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), the language relied upon by the government should not be taken literally so as to require standing. In *Peters* a habeas corpus petitioner contended that his fourteenth amendment rights were violated because blacks were systematically excluded from the state grand jury that indicted him and the petit jury that convicted him. The Fifth Circuit affirmed a denial of the petition on the ground that, since petitioner was white, he could not be "denied equal protection because he was indicted and convicted by juries from which Negroes were excluded." *Peters v. Kiff,* 441 F.2d 370, 371 (5 Cir. 1971). On appeal, the Supreme Court reversed. The opinion of the Court, written by Justice Marshall and joined by Justices Douglas and Stewart, while reserving consideration on equal protection grounds,[12] nonetheless held that discrimination in the composition of grand and petit juries denies any defendant due process also mandated by the fourteenth amendment. The Court was unwilling to assume that the exclusion of blacks from a jury would be relevant only if the defendant was black since "their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." *Id.* at 503–04, 92 S.Ct. at 2168–69, 33 L.Ed.2d at 94. The opinion of the Court concluded as follows:

> In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few.

*Id.* at 504, 92 S.Ct. at 2169, 33 L.Ed.2d at 95. Concurring, Justices White, Brennan, and Powell stated their view that the statutory

---

**11.** Only one defendant is black (Louis Harvey in 81–75A) and only one is female (Janie Byrd in 79–154A). Gov't Ex. K.

**12.** 407 U.S. at 497 n.5, 92 S.Ct. at 2165 n.5, 33 L.Ed.2d at 90 n.5.

policy of 18 U.S.C. § 243, which prohibits state and federal officials from disqualifying grand and petit jurors on the basis of race, "reflects the central concern of the Fourteenth Amendment with racial discrimination" and should be implemented "by permitting petitioner to challenge his conviction on the ground that Negroes were arbitrarily excluded from the grand jury that indicted him." 407 U.S. at 507, 92 S.Ct. at 2170, 33 L.Ed.2d at 96.[13]

*Peters* was relied upon by Judge Hatchett in *Jenison* and *Holman* for the proposition that "[s]tanding to challenge exclusion resulting in a violation of the fifth and sixth amendments exists regardless of whether the defendant is a member of the excluded class." *Holman, supra,* at 1178; see *Jenison, supra,* at 659. Furthermore, the Sixth Circuit in *Rose, supra,* at 136, stated in dicta that whites would have standing to challenge racial discrimination in the selection of foreperson.

The Fifth Circuit has stated that in *Peters* "[t]he Court made it clear that . . . every defendant has the same right to object to an unconstitutional jury selection system." *Watson v. United States,* 484 F.2d 34, 37 (5 Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974). And directly on point is *Mayfield v. Steed,* 345 F.Supp. 806 (E.D.Ark.1972), *aff'd per curiam* 473 F.2d 691 (8 Cir. 1973), wherein the district court held on the basis of *Peters* that "petitioner, a male, [was] deprived of due process of law by the systematic exclusion of women from the jury panel." 345 F.Supp. at 806. Additional support for defendants' position on the standing issue may be found in *Spinkellink v. Wainwright,* 578 F.2d 582 (5 Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). In *Spinkellink* the Fifth Circuit held that petitioner, a white person, had standing to assert that Florida's imposition of the death penalty was racially discriminatory. *Id.* at 612 & N.36.

We therefore decline to hold that *Peters* was overruled by implication in *Rose.*

Since *Peters* held that any defendant has standing under the due process clause of the fourteenth amendment to challenge juror discrimination, we likewise hold that all defendants here have standing under the fifth amendment to assert discrimination in the appointment of forepersons. *See Johnson v. Robison,* 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39 L.Ed.2d 389, 396 n.4 (1974).

(c) *Did Defendants Establish a Prima Facie Case?*

■ Having found that discrimination in the selection of federal grand jury foreperson may be challenged on fifth amendment grounds by all defendants, we now proceed to determine whether defendants have proved a prima facie case of discrimination. The prima facie case requirements established in *Rose* are as follows:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time. . . . This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

443 U.S. at 565, 99 S.Ct. at 3005, 61 L.Ed.2d at 755 (ellipses and brackets in original) (quoting *Castaneda, supra,* 430 U.S. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d 498).

There can be no dispute that blacks and women constitute distinct classes and that the foreperson selection procedure, which relied upon questionnaires that indicate race and sex, is susceptible of abuse.

---

**13.** The Chief Justice, joined by Justices Blackmun and Rehnquist, dissented upon the view that the petitioners had shown no prejudice and therefore lacked standing.

Therefore, the only question concerning the adequacy of the prima facie case is whether the degree of underrepresentation, over the significant period of time under review, is so substantial as to imply purposeful discrimination.

As heretofore found, an absolute disparity of 13% exists between the percentage of black foreperson selections and the percentage of blacks between the ages of 18 and 69.[14] Since the Supreme Court has held that a prima facie case may not be "satisfactorily proved by showing that an identifiable group in the community is underrepresented by as much as 10%," *Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, 766 (1965), the 13% disparity in the percentage of black forepersons and the percentage of jury-eligible blacks in the Northern District of Georgia is "razor thin" and "may be easily rebutted." *Blackburn, supra*, 639 F.2d at 1127.

The 47.1% absolute disparity between the percentage of female foreperson and females in the district's jury-eligible population is, however, clearly sufficient to establish a prima facie case of gender discrimination in the selection of forepersons.

### (d) *Did the Government Rebut the Prima Facie Case of Discrimination?*

We have found no case discussing in detail the procedures available to the government to rebut a prima facie showing of jury discrimination. Certain concepts, however, are well-established. In *Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1225–26, 31 L.Ed.2d 536, 542 (1972), the Court stated that "[o]nce a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that racially neutral selection procedures have produced the [disparity]." The ultimate question regarding purposeful discrimination *vel non* must "be determined from the facts in each particular case." *Patton v. State of Mississippi*, 332 U.S. 463, 466, 68 S.Ct. 184, 186, 92 L.Ed. 76, 78 (1947). Based upon all relevant evidence, we conclude that the government has effectively rebutted the prima facie showing of discrimination in the selection of grand jury forepersons.

Initially, we note that defendants' prima facie showing is significantly weakened when deputy selections are considered along with foreperson appointments. As previously found, the absolute disparities in the relevant population would at once be reduced to 10.7% because of race and 31.2% because of sex. These disparities are reduced even further if one compares the percentage of the groups' forepersons and deputies against the percentage of those groups found on the actual grand juries.[15]

14. The government argues that defendants' population data is insufficient to prove a prima facie case since it does not account for literacy and other juror requirements. This argument is without merit. The prima facie case requirements of *Rose* clearly provide that the degree of underrepresentation is to be compared with the "proportion of the group in the total population." While we would be inclined to use "more meaningful eligible population statistics [if] those statistics [were] in the record," *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1123 (5 Cir. 1981), the government failed to introduce population figures which took into account factors beyond the data submitted by defendants.

In addition, the government maintains that the positions of foreperson and deputy should be considered together and that the proportions of black and female forepersons and deputies should be compared with the proportions of blacks and females in the grand juries themselves, since the individuals selected to fill those offices must be appointed from the members of the grand jury. Of the cases dealing with alleged foreperson discrimination, only *Cross, supra*, deemed it appropriate to consider deputy appointments along with foreperson selections. Furthermore, no case has ever compared the proportion of black or women forepersons with the proportion of those groups in the actual grand juries. Therefore, we conclude that, although these factors are relevant as rebuttal evidence, neither deputy appointments nor the proportion of the classes in the grand juries at issue should be considered to determine whether a prima facie case has been made.

15. This comparison has probative value because the judges were required to select forepersons and deputies from the members of the grand jury. If the grand juries in question were composed solely of white males, defendants could not successfully mount a challenge based on the fact that no women or blacks

Under this analysis, the absolute disparity for blacks is minimal, 1.8% and for females 20%.

We also find relevant the fact that eleven district judges, utilizing differing criteria devised by each judge without consultation with anyone, made the foreperson and deputy appointments over a ten-year span, encompassing 47 grand juries. This is not a situation where prescribed or standardized "qualifications" for the offices were established in advance. The judges certainly had the right as well as the duty to exercise sound discretion in determining those qualities desirable for forepersons and deputies.

Furthermore, the predominant criteria of occupation, education, and age, were standards not only objective but clearly relevant to the specific tasks required by Rule 6(c), F.R.Crim.P.,[16] to be performed by forepersons and deputies and as visualized by the judges.

Finally, and most important, the substantial evidence is that the stated criteria were in fact faithfully applied. We have before us more than simple protestations of officials regarding lack of intent to discriminate since "the assertions by the judges . . . are strongly corroborated by other evidence in the record." *See Blackburn, supra,* at 1128. Grand jurors appointed as forepersons and deputies actually possessed the qualities which the judges were seeking, i. e., they had in large part responsible employment positions and/or significant education, and were of mature age.[17] Indeed, defendants do not challenge the sufficiency of the qualifications of the persons appointed but maintain only that others on each grand jury might have been no less qualified. Though this possibility cannot be excluded, it is hardly a sufficient reason to affect the integrity of the selections that

were made. We reject defendants' contention that the judges were required to elicit additional information from, or about, randomly-drawn grand jurors to seek out for appointment blacks and women who might be "qualified" as forepersons but whose jury questionnaires did not affirmatively indicate such "qualification." The Constitution did not require the appointing judges to accord preferential treatment to any group but imposed upon them no more than the obligation to use nondiscriminatory, neutral criteria in selecting persons deemed adequate to perform the role of foreperson. *Cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207, 219 (1981). We conclude on the facts of this record that this obligation has been effectively met.

The court holds that defendants' motions to dismiss their indictments are without merit and must be denied.

Orders will be entered accordingly.

---

were selected as foreperson; rather, their remedy would be to attack the adequacy of the source from which grand jurors are drawn.

**16.** Rule 6(c), F.R.Crim.P.:

(c) FOREMAN AND DEPUTY FOREMAN. The court shall appoint one of the jurors to be foreman and another to be deputy foreman. The foreman shall have power to administer oaths and affirmations and shall sign all indictments. He or another juror designated by him

shall keep a record of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court, but the record shall not be made public except on order of the court. During the absence of the foreman, the deputy foreman shall act as foreman.

**17.** See Jt. Ex. 124 to 165 and Def't Ex. S–1 to S–5.