UNITED STATES of America

v.

James J. DONOHUE, III.

UNITED STATES of America

v.

Peter D. BOAS, Timothy Fuller, and
Alfred Kincaid.

UNITED STATES of America

v.

Rev. Fred E. SNOWDEN, John C.
Boatwright, Sr., and Calvin D.
Boatwright.

Crim. A. Nos. B–82–00241, R–82–00503
and K–82–00510.

United States District Court,
D. Maryland.

May 11, 1983.

See also 574 F.Supp. 1263.

J. Frederick Motz, U.S. Atty., D. of Md., and Elizabeth H. Trimble and Max H. Lauten, Asst. U.S. Attys., Baltimore, Md., in Crim. No. B–82–00241; James C. Savage, Asst. U.S. Atty., in Crim. No. R–82–00503; and Mark H. Kolman and Barbara S. Sale, Asst. U.S. Attys., Baltimore, Md., in Crim. No. K–82–00510, for United States.

Alan I. Baron, Baltimore, Md., John A. Field, III, Alexandria, Va., and Burton J. Haynes, Washington, D.C., for defendant in Crim. No. B–82–00241.

Marvin D. Miller, and John Kenneth Zwerling, Alexandria, Va., and John Privitera, Washington, D.C., for defendants in Crim. No. R–82–00503.

Alan I. Baron, Baltimore, Md., and Thomas R. Dyson, Jr., Washington, D.C., for defendants in Crim. No. K–82–00510.

WALTER E. BLACK, Jr., District Judge.

Currently pending before the Court are the motions to dismiss the indictments in the captioned cases for sex discrimination in the selection of grand jury forepersons and grand jury members. The Court has had the benefit of memoranda filed on behalf of the parties, as well as oral argument presented at a consolidated hearing on April 15, 1983. For the reasons hereinafter set forth, these motions will be denied.

The captioned three suits have been consolidated for the purposes of these motions. In Criminal No. B–82–00241, the indictment charges defendant James J. Donohue, III, with four counts of filing a false income tax return, one count of obstruction of justice, and two counts of influencing a witness, as well as aiding and abetting. In the second suit, Criminal No. R–82–00503, the one-count indictment charges the three defendants, Peter D. Boas, Timothy Fuller, and Alfred Kincaid, with conspiracy to import marijuana. The indictment in Criminal No. K–82–00510, charges each of the three defendants, Rev. Fred E. Snowden, John C. Boatwright, Sr., and Calvin D. Boatwright, with eight counts of mail fraud and aiding and abetting. Defendant Snowden is charged with an additional three counts of tax evasion.

## MOTION TO DISMISS THE INDICTMENTS FOR SEX DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS

Initially, the Court will address motions to dismiss the indictments for sex discrimination in the selection of grand jury forepersons. The gravamen of these motions is that the jury selection plan for the District of Maryland contains no provision for the method or criteria for selection of the grand jury foreperson. Defendants contend that the jury selection plan is only ostensibly in compliance with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.*, ("the Act"), because selection of the grand jury foreperson and deputy foreperson is the decision of the judge designated as grand jury judge, and no objective criteria have been articulated to guide his decision. Defendants further contend that the method of selection is thus

wholly subjective, with the resulting exclusion from service as grand jury foreperson persons of lower economic positions, blue collar workers, blacks, women, and other cognizable groups. This exclusion allegedly has deprived defendants of their fifth amendment rights under the Due Process clause and of their sixth amendment rights to an impartial jury. In addition, defendants allege violation of the Act.

On August 2, 1982, and January 7, 1983, Orders were signed in Criminal Nos. B–82–00241 and R–82–00503, making available to counsel for defendants the contents of all papers, records, or other relevant material used by the Jury Commissioner or Clerk in connection with the selection process for grand jury foremen and deputy foremen. Counsel forwarded the results of the inspection and/or copying to defendants' expert witness. Based on the expert's statistical analysis,[1] defendants pressed their motion only as to sex discrimination.

Defendants' argument that discrimination in the selection of the grand jury foreperson has a constitutional significance rests on the United States Supreme Court's decision in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The *Mitchell* respondents, both of whom were black, moved to dismiss their indictments on the grounds of race discrimination in the selection of the Tipton County, Tennessee, grand jury and its foreman. After the state court's denial of this motion and their subsequent murder convictions, respondents raised the same issues in petitions for writs of habeas corpus. After a lengthy discussion which culminated in a holding that discrimination in selection of the state grand jury foreperson and the state grand jury could be properly chal-

---

1. The expert James Fennessey, Senior Associate of Chesapeake Management Support Systems, first compared the proportion of female grand jury foremen to the proportion of females among the registered voters and found that the actual proportion of females was .160 (8 female forepersons over 50 grand jurors). This analysis indicates a difference, in standard deviation units, of –5.160.

Second, the expert compared the proportion of female grand jury forepersons to the proportion of females actually serving on grand juries and found a difference of –4.612 in standard deviation units.

The expert labeled both of these differences as "quite unmistakeably statistically significant." (Exhibit to Defendant's Supplemental Memorandum, Paper 52, filed November 2, 1982 in Criminal No. B–82–00241)

lenged in a habeas corpus proceeding, 433 U.S. at 550–64, 99 S.Ct. at 2997–3004, Justice Blackmun held that respondents had not made out a prima facie case of violation of the Equal Protection clause of the fourteenth amendment, 443 U.S. at 573–74, 99 S.Ct. at 3009. The Supreme Court thus overturned the Sixth Circuit's holding that the convictions must be set aside due to discrimination in selection of the foreperson. *Id.* at 573, 99 S.Ct. at 3009.

Subsequent to the *Mitchell* decision, and while the consolidated motions here were pending, the Fourth Circuit addressed a motion to dismiss an indictment based on discrimination in the selection of a federal grand jury foreperson, rather than a state grand jury foreperson. *See United States v. Hobby,* 702 F.2d 466 (4th Cir.1983). The Court of Appeals distinguished the ministerial duties of the federal grand jury foreperson from those of the foreperson of the state grand jury in *Mitchell.* At 470–471; *accord,* Note, *Constitutional Challenges to Grand Jury Foreperson-Selection Procedures,* 17 Ga.L.Rev. 153, 171–74 (1982) [hereinafter cited as "Foreperson Selection"]. It noted that forepersons in Tennessee are selected from the eligible population at large, not from those selected to serve on the grand jury. Their terms are two years. Their authority is greater than that of a presiding officer: they are authorized to assist the prosecutor in investigating crime and to order the issuance of subpoenae to witnesses. Indictments without their signatures are fatally defective. Slip op. at 11. Compared with that of the Tennessee foreperson, the Fourth Circuit found that the impact of the federal grand jury foreperson is minimal. *Id.* "Any suspicion that his office may enlarge his capacity to influence other grand jurors is too vague and uncertain to warrant dismissal of indictments and reversal of convictions." *Id.* at 470–471. Because this role is only

minimally different from that of the other grand jurors, the Fourth Circuit held that the rights of defendants are adequately protected if the composition of the grand jury as a whole is not the result of a discriminatory selection process. *Id.* at 471; *accord, United States v. Coletta,* 682 F.2d 820, 824 (9th Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983) (no significance under Due Process clause because no fundamental unfairness; no standing under Equal Protection clause). *But see United States v. Perez-Hernandez,* 672 F.2d 1380, 1385–86 (11th Cir.1982) (significance under fifth amendment but not sixth amendment).

■ Despite the Fourth Circuit's recent, timely decision, defendants urge consideration of an affidavit executed by a professor of social psychology. (Affidavit of John Lamberth, Associate Professor of Psychology at Temple University, filed with the Court on April 15, 1983, Criminal No. R–82–00503). Although, due to the secrecy rule, the professor concedes that there are no published studies in which grand jury group dynamics were observed directly, he asserts that the United States Supreme Court has made use of the findings of experimental and simulation studies of group dynamics. The professor's conclusions are based on literature of small group dynamics and decision-making and his own research with mock petit jurors. He suggests that because the foreperson is appointed by the court, the power associated with the court is vested in him or her. Thus, influence of the foreperson is equivalent to that of three to five other grand jurors.

In addition, Professor Lamberth states that he has surveyed the duties of grand jury forepersons in this district.[2] This survey led him to conclude that

---

2. Professor Lamberth lists the following duties set out in the Handbook for Federal Grand Jurors (dated May, 1980):

 a) Presiding Officer of the Grand Jury (p. 9).
 b) To receive communications from other grand jurors when they cannot attend (p. 10).
 c) To swear witnesses (p. 11).

 d) To be the first of the grand jurors to question witnesses (p. 11).
 e) To determine whether an interpreter is needed (p. 11).
 f) To ask members of the Grand Jury to discuss and vote upon the evidence after all

[t]o act as a chairman, to have the authority to excuse jurors, and to have access to the notes ·of each grand juror means that the individual presides and is in a position of knowing individual jurors [sic] views and opinions before deliberations begin. Because the foreperson in the District of Maryland is granted these additional, significant, powers that even go beyond those of most small group leaders he or she is far more than a functionary and has much greater influence than the one vote he or she casts and even beyond the influence explained ... above. (Lamberth affidavit, at 4).

This Court is unable to accept an argument that if this conclusion had been available to the Fourth Circuit, the appellate court would have rendered a different decision. This Court must assume that the Fourth Circuit is aware that the federal grand jury foreperson is assigned at least some of the duties assigned in this district. Indeed, most of these special duties can only be described as ministerial. They are not comparable to the duties of the foreperson of the Tennessee grand jury who assists in investigating crime and orders the issuance of subpoenae to witnesses. An argument that the foreperson in this district actually derives power from having access to the notes of the other grand jurors is merely speculative.

Also speculative is Professor Lamberth's contention that the federal grand jury operates in the manner suggested from study of mock, petit jurors and literature of small group dynamics and small group decision-making. It is probable, however, that the studies of petit jurors are only marginally relevant, since the grand jury is significantly larger. The grand jury may not even qualify as a "small group." Furthermore, the dynamics of the federal grand jury may remain a mystery due to Rule 6(e) of the Federal Rules of Criminal Procedure and its underlying policy promoting secrecy.

This Court is not the first to reject an expert opinion that a federal grand jury foreperson selected by a judge exerts more influence during deliberations than the average grand juror. *See United States v. Abell,* 552 F.Supp. 316, 321 (D.Me.1982) (significance of federal grand jury foreperson under fifth amendment, but not sixth amendment); *United States v. Musto,* 540 F.Supp. 346, 351, 359–63 (D.N.J.1982) (no significance of federal grand jury foreperson under sixth amendment, no standing under fifth amendment); *United States v. Breland,* 522 F.Supp. 468, 471, 475 (N.D. Ga.1981). In testimony before the district court for the Northern District of Georgia, one expert, a social psychologist, conceded that a foreperson who did not, in fact, lead discussions during deliberations would not exert greater than average influence. He also acknowledged that over a period of time natural leaders would emerge, wielding greater influence than the foreperson. A second expert agreed that grand juries must differ from petit juries in that there is less dissent in grand juries, thus providing less opportunity for influence by a single juror. *United States v. Breland, supra,* at 475. This combined testimony led the dis-

---

other persons than Grand Jury members have left the room (p. 13).

g) To keep a record of the number of jurors concurring in the finding of every indictment and to file the record with the Clerk of the Court (p. 13).

h) To report to the Court a "not true bill" immediately if the individual charged is in jail or out on bail so that they may be immediately released (p. 13).

He lists the following duties set out in the Instructions to the Forepersons of Grand Juries:

 a) The foreperson is responsible for conducting the meetings of the Grand Jury, for calling the role, for assuring a quorum is present and to exclude unauthorized persons.

b) The foreperson acts like the chairman of a committee, recognizing members for purposes of addressing questions to witnesses.

c) The foreperson has the authority to excuse individual jurors from specific meetings of the Grand Jury.

d) The foreperson signs indictments and responds for the Grand Jury in open court when an indictment is presented.

e) The foreperson has access to the notes of all grand jurors, which are to be kept by the Clerk at the end of each session, and given to the foreperson at the beginning of the next session.

trict court to conclude that "it appears more reasonable that strong and forceful persons will naturally have influence over the less assertive regardless of which individual is foreperson." *Id.* Although the court held that the foreperson lacked constitutional significance under the sixth amendment, with some reluctance it followed the Fifth Circuit's assumption of constitutional significance under the fifth amendment. *Id.* at 475–77.

This Court agrees with the *Breland* court's assessment of the expert testimony. Accordingly, the Court holds that it must adhere to the recent Fourth Circuit decision, and defendants' motions to dismiss the indictments for sex discrimination in the selection of the grand jury forepersons will be denied.[3]

## MOTIONS TO DISMISS THE INDICTMENTS FOR SEX DISCRIMINATION IN SELECTION OF GRAND JURY MEMBERS

Defendants move to dismiss the indictments on a second basis. They contend that there has been a pattern and practice occurring since at least 1973 of discrimination against women in the selection of grand jury members. The resulting under-representation of women on the grand jury in this district allegedly violated the sixth amendment, Equal Protection clause as implied in the Due Process clause of the fifth amendment, and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.*

### *Applicable Legal Standards*

■■■ The fair cross-section requirement of the sixth amendment has been regarded as an essential element in a system of checks and balances: one articulated function of the jury is to provide a check against an "overzealous or mistaken prosecutor" or the "overconditioned or biased

response of a judge." *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). Elaborating on this conception, the Supreme Court has stated:

Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case.... [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 227 [66 S.Ct. 984, 989, 90 L.Ed. 1181] (Frankfurter, J. dissenting).

*Id.* 419 U.S. at 530–31, 95 S.Ct. at 697–98. The policies underlying the sixth amendment have been extended to the federal grand jury in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.,* in which Congress declared that

[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to ... grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

28 U.S.C. § 1861 (in pertinent part).

■■■ The elements of a prima facie violation of the fair cross section requirement are well-settled. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58

---

**3.** The motion as filed on behalf of defendant Donohue, Criminal No. B–82–00241, may also be dismissed for lack of standing. A male defendant has no standing to challenge the discriminatory exclusion of women from the position of foreperson when the foreperson of his indicting grand jury was female. *United States v. Phillips,* 701 F.2d 169 (4th Cir.1983). While a number of grand juries were involved in the grand jury investigation of Donohue, the foreperson of his indicting grand jury was female.

L.Ed.2d 579 (1979). The defendant must establish:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

The policies underlying the Equal Protection guarantee against discrimination in selection of grand jurors are also fundamental. *See Rose v. Mitchell*, 443 U.S. at 555–56, 99 S.Ct. at 2999–3000. As enunciated in a suit alleging racial discrimination, they appear similar to the policies underlying the fair cross section requirement:

Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, or any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized, such discrimination "not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole. "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts."

*Id.* (citations omitted). The equal protection and fair cross-section guarantees touch upon values so fundamental that when a defendant has proven a violation, he is entitled to the reversal of a conviction without a showing of actual prejudice to him. *Id.* at 556, 99 S.Ct. at 3000; *See Taylor v. Louisiana*, 419 U.S. at 527–33, 535–38, 95 S.Ct. at 700–01, ——. *See generally*, W. Diamond, *Federal Remedies for Racial Discrimination in Grand Juror Selection*, 16 Col.J. of L. and Soc. Problems 85 (1980).

The elements of a prima facie case of violation of the Equal Protection Clause in the selection of the grand jury are also well-settled:

The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied.... Next, the degree of under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.... Once the defendant has shown substantial underrepresentation of his group, he has made a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut the case.

*Folston v. Allsbrook*, 691 F.2d 184, 186 (4th Cir.1982), quoting *Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (citations and footnotes omitted); *accord, Moultrie v. Martin*, 690 F.2d 1078, 1081 (4th Cir.1982). The prima facie case for violation of the Equal Protection Clause has been described as virtually identical to that for violation of the sixth amendment. *See United States v. Perez-Hernandez, supra*, at 1384 n. 5. To the contrary, one commentator has stated that the prima facie cases for violation of the fifth and sixth amendments share only the elements of a cognizable group and statistical showing. *See* Foreperson Selection at 167–68 and n. 57.

■ "There is a significant distinction, however, in the way that each prima facie case may be rebutted." *United States v. Perez-Hernandez, supra.* An Equal Protection claim may be rebutted by a showing of the absence of discriminatory intent. *Id.,* citing *Casteneda v. Partida,* 430 U.S. at 497–98, 97 S.Ct. at 1281–82; *see Folston v. Allbrook, supra,* at 186. In comparison, discriminatory intent is irrelevant to a sixth amendment violation: the prima facie case may only be rebutted by showing a significant state interest which justifies the imbalance. *United States v. Perez-Hernandez, supra,* at 1384 n. 5, citing *Duren v. Missouri,* 439 U.S. at 367–68, 99 S.Ct. at 670.

■ It is beyond dispute that women comprise a cognizable group for the purposes of the first element of the prima facie cases for violations of either the sixth amendment or Equal Protection Clause. *See, e.g., Duren v. Missouri, supra; Taylor v. Louisiana, supra; Bryant v. Wainwright,* 686 F.2d 1373, 1376 (11th Cir.1982).

■ On the other hand, the statistical showing necessary to establish the second element of either prima facie case has not been well-defined by most courts. Generally, the courts have preferred to avoid a mechanical approach. *Bryant v. Wainwright, supra.* Frequently cited, however, is the Supreme Court's decision in *Swain v. Alabama,* 380 U.S. 202, 208–09, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965), in which the Court stated that purposeful discrimination was not established merely by a showing that a distinct group was underrepresented by as much as 10%. *See, e.g., Bryant v. Wainwright, supra; United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.) *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *United States v. Breland, supra,* at 479; *United States v. Blair,* 493 F.Supp. 398, 408 (D.Md.1980) (Harvey, J.), *judgment aff'd,* 665 F.2d 500 (4th Cir.1981). The Court found no violation of the Equal Protection Clause based on a showing that blacks were underrepresented on Alabama petit juries at a rate of 11 to 16%. 380 U.S. at 205, 208–09, 85 S.Ct. at 827, 829.

Thus, a showing of a 13% absolute disparity has been termed " 'razor thin' " and " 'may be easily rebutted.' " *United States v. Breland, supra,* at 479 (black grand jury forepersons), quoting *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1127 (5th Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981); *cf. Alexander v. Louisiana,* 405 U.S. 625, 629–32, 92 S.Ct. 1221, 1224–26, 31 L.Ed.2d 536 (1972) (absolute disparity of 14% of blacks on state grand juries sufficient if procedures particularly lend themselves to discrimination). Other courts have rejected absolute disparities falling below the *Swain* minimum guidelines. *See, e.g., Bryant v. Wainwright, supra,* at 1377 (absolute disparity of blacks 7.4%); *United States v. Musto, supra,* at 356 (5.4% absolute disparity of blacks on grand and petit juries, 4.2% absolute disparity of Hispanics); *United States v. Blair, supra,* at 409 (absolute disparity of women on qualified jury wheel of 3.1%). While the Constitution does not require the jury to be a "statistical mirror" of the population, *United States v. DiTommaso,* 405 F.2d 385, 389 (4th Cir.1968), *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); *United States v. Blair, supra,* at 408, a showing of a substantial disparity satisfies the second element of the prima facie case. *See, e.g., Casteneda v. Partida,* 430 U.S. at 496, 97 S.Ct. at 1281 (absolute disparity of 40.1% for Mexican-American grand jurors); *Duren v. Missouri,* 439 U.S. at 364–66, 99 S.Ct. at 668–69 (absolute disparity of 38% for women on petit juries); *Turner v. Fouche,* 396 U.S. 346, 359–60, 90 S.Ct. 532, 539–40, 24 L.Ed.2d 532 (1970) (absolute disparity of 23% for blacks on grand jury); *United States v. Breland, supra,* at 479 (absolute disparity of 47.1% for female forepersons). *But see United States v. DiTommaso, supra,* at 391 (29% average representation of women on grand juries not unconstitutional under "key man" system).

The Fourth Circuit recently took the opportunity to define "substantial disparity" and articulate the standards for a statisti-

cal showing. *See Moultrie v. Martin, supra.* The *Moultrie* petitioner, a black who had been convicted of murder, filed a petition for a writ of habeas corpus alleging that blacks were underrepresented on the Colleton County, South Carolina grand jury, in violation of the Equal Protection Clause. After the district court had denied the petition, the Fourth Circuit examined the grand jury statistics for a seven-year period, 1971 through 1977. The South Carolina jury selection scheme permitted jury commissioners to grant exemptions to potential jurors whose names had been obtained from voting lists. The system had resulted in 31 black grand jurors out of a total of 126. The court noted that in 1977 the county voting roles were 38% black. Petitioner did not provide comparable statistics for other years, a significant omission. 690 F.2d at 1079–80. The court at first rejected petitioner's request to isolate statistics for 1977, the year he was indicted, because of the small size of the sample. (Approximately 18 grand jurors served per year.) *Id.* at 1080–81. The first year examined was 1971 only because that was the first year for which statistics were provided. *Id.* at 1081.

The *Moultrie* court next rejected petitioner's methodology. Petitioner had compared the percentage of blacks on the grand jury with the percentage of blacks in the total population (to obtain an absolute disparity) which showed an average underrepresentation of 22% over the seven-year period. *Id.* at 1081–82. First, the court held that the correct comparison was with the voting lists, not the total population, because the grand jury list was based on the voting lists. Second, the court held that comparison of straight percentages (absolute disparity) was incorrect, although the Supreme Court had done so in *Castaneda.* The Fourth Circuit found significant a footnote in that Supreme Court decision, 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17, in which the Supreme Court described the statistician's formula for determining a

standard deviation. Because statistical tests become more dependable with sample size, use of this methodology was preferable: it permitted an adjustment for sample size. *Id.* at 1082–83. The court also described a methodology for use with a small sample, one of less than 30 to 40. *Id.* at 1083–84, nn. 7, 10. Finally, the Fourth Circuit adopted a minimum standard for a statistical showing, quoting *Castaneda,* 430 U.S. at 497, n. 17, 97 S.Ct. at 1281, n. 17: " 'As a general rule for ... large samples, if the difference between the unexpected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.' " *Id.* at 1084.

Application of its newly adopted methodology led to the court's holding that Moultrie had not made out a prima facie case. *Id.* at 1085. For the entire seven-year period the court computed a standard deviation of 2.9. It then deleted statistics for the earlier year, 1971, because they were considerably different from those for other years. It thus obtained an average standard deviation of 2.0. It noted that in two years since 1971 the standard deviations showed a slight overrepresentation of blacks. After finding that the standard deviation for the latest six years would not be significant to a social scientist, the court isolated the year 1977, when the petitioner was indicted. The standard deviation for that year was 1.8. *Id.* at 1084. The borderline nature of the standard deviation figures for either the six or seven year periods led the appellate court to consider the jury commissioners' testimony that they had exempted more whites than blacks. After criticizing the petitioner's failure to provide statistics on exemptions for whites and blacks, the Fourth Circuit labeled petitioner's showing "marginal," upholding the denial of the petition for writ of habeas corpus. *Id.* at 1085.[4]

---

**4.** The Fourth Circuit held that even if *Folston* had established a prima facie case, the state of North Carolina had rebutted any inference of

intentional discrimination because its selection system was random. *See Moultrie v. Martin,* 690 F.2d 1078, 1086 (4th Cir.1982).

### Standing

The Fourth Circuit recently clarified not only the methodology appropriate for a statistical showing, but also the standing requirement. In *Folston v. Allsbrook, supra*, at 185–86, apparently alleging denial of Equal Protection, a white male sought a writ of habeas corpus due to an underrepresentation of women on the grand jury. The court agreed that Folston had standing. 691 F.2d at 186 n. 3; accord, *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). Moreover, its holding would have been the same if Folston had alleged violation of the sixth amendment. *See Taylor v. Louisiana, supra.*

 It is likewise clear that a plaintiff may assert underrepresentation of a group on the jury list, although there was no such underrepresentation on his jury. Writing for a three-judge district court panel, Judge Kaufman (now chief judge of this district) quoted Judge Learned Hand's opinion in *United States v. Dennis*, 183 F.2d 201, 216 (2d Cir.1950), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951):

"* * * [W]e will assume that any party to a suit, civil or criminal, is entitled to have the particular panel which tries his case, drawn at random from a list which is not unlawfully weighted, and that he may complain even though he has not shown that the imbalance has prejudiced him. The question therefore becomes whether the grand panel and the petit panel which respectively found the indictment and tried the case were drawn from an unlawful list."

This, wrote Judge Hand (at 216) was true even though the individual jury "* * * taken by itself * * * was unexceptionable."

*United States v. Cohen*, 275 F.Supp. 724, 739 (D.Md.1967), *aff'd on other grounds* in *United States v. DiTommaso, supra; accord, Thiel v. Southern Pacific Co.*, 328 U.S. 217, 225, 66 S.Ct. 984, 988, 90 L.Ed. 1181 (1946).

 Based on the case law, there is no dispute that the defendants here have standing.[5]

### The Prima Facie Case

 Because it is well-established that women are a cognizable group, *see Duren v. Missouri, supra*, the Court will focus on the second element of the prima facie case, the statistical showing. Defendants' expert, James Fennessey, Senior Associate of Chesapeake Management Support Systems, examined 70 grand juries that operated in the years 1973 to 1982, as well as the 1980 Presidential election figures. He found that women comprised 48.8% of the grand jurors and 52.4% of the registered voters. These figures resulted in a standard deviation of −2.826, with the probability of such a score occurring by chance of one in 400.

At the consolidated hearing on April 15, 1983, the data was updated to include figures from all 84 grand juries sitting between March 1973 and September 1982. During that period there were 943 female and 989 male grand jurors. The relevant standard deviation was −3.298 with a probability of chance occurrence of one in 2000.[6] The Government agreed that these numbers are correct, without conceding that they establish the requisite showing.

While these figures ostensibly appear significant, the Court questions their credibility on a number of bases. As mandated by *Moultrie*, 690 F.2d at 1082, defendants used voting list figures. Unfortunately,

---

**5.** The fact that defendants are all males challenging the underrepresentation of women is irrelevant. Also irrelevant is the fact that the grand jury which indicted Peter D. Boas, Timothy Fuller, and Alfred Kincaid, Criminal No. R–82–00503, was comprised of 16 women and 10 men. A number of juries were involved in the investigations of the other defendants. After adding the numbers of men and women who served on all these grand juries, the Court notes

that in the other two cases, the number of men exceeded the number of women by only one grand juror.

**6.** The Clerk's Office of this Court has provided figures for the 14 most recent grand juries from March 1982 through March 1983. These figures show that 52.55% out of 411 grand jurors were female and 47.44% were male.

they were unable to obtain year-by-year figures, a failing shared by the petitioner in *Moultrie*. *Id.* at 1080. The Court is thus in the position of comparing figures for the 1980 Presidential election with grand jury figures for a period of nearly ten years, most of which antedated the election. In fact, the 1980 election figures were only used to form the jury lists beginning in early 1981. Consequently, the 1980 Presidential election figures are not a valid basis for comparison for two reasons: they were not available as a basis for the jury list during almost the entire 1973–1982 period, and they are unlikely to be an accurate reflection of the registered voters for most of the period, especially the earlier years.

Furthermore, defendants' expert concedes an "error rate" of approximately 6% in the estimates for registered voters, a term "not well-defined by statistical convention." The expert's calculation that approximately 52% of the registered voters are female therefore contains an implicit margin of error, since it was derived from comparing the flawed estimate of the number of registered voters of both sexes in Maryland with the 1980 census figures.

Also questionable is the defendants' choice of period to examine. All defendants were indicted in 1982. A less arbitrary choice of period might have been the year from September 1981 to September 1982 or the period from early 1981 to September 1982, reflecting use of the 1980 election figures in formation of the jury list. Unlike the *Moultrie* sample which involved only 126 grand jurors over a seven-year period, *id.* at 1080, defendants' sample contains figures for approximately ten years, totalling 1932 grand jurors. Clearly, examination of figures for even a one-year period would not entail special methodology for small samples, defined as 30 to 40 in *Moultrie*. *Id.* at 1083 nn. 7, 10. In that case the Fourth Circuit examined the figures for the year that petitioner was indicted, despite the small size of the sample, noting that the standard deviation for that year was not significant. *Id.* at 1084–85. Here, defendants' choice of the 1973

through 1982 period seems particularly inappropriate.

Because of defendants' arbitrary choice of period and defective comparison using 1980 estimated registered voters figures, the Court holds that they have not made the requisite statistical showing. The Court notes that the cases in which the showing has been made, described above, involved striking absolute disparities. If defendants' figures were to be accepted here, the Court could compare 52% women on the voting lists and 48% women on the grand juries, an absolute disparity of only 4%. This disparity translates into a difference of less than one grand juror on each grand jury. This Court is aware, however, that in *Moultrie* the Fourth Circuit dictated use of a standard deviation analysis. *Id.* at 1082–83. A standard deviation of –3.298 would be significant to a social scientist. *Id.* at 1084. Even if that standard deviation, as determined here by defendants' expert, were significant to a social scientist, it is not significant to this Court for the aforementioned reasons.

The Court's conclusion is buttressed by examination of the jury selection plan for this district. This plan provides for random selection of jurors from voter registration lists based on the most recent statewide general election or most recent federal general election prior to each drawing. The plan provides for proportional representation on the Master Jury Wheel of at least one-half of one percent of the total number of registered voters for each county and Baltimore City, within a minimum of 1,000 names. A random selection from the Master Jury Wheel results in a prospective juror list.

The Clerk sends juror qualification forms to those on this list and may summon those who fail to return the form. A designated judge determines from the returned questionnaires whether a potential juror may be exempted due to his or her occupation or one of seven groups for whom jury service "would entail undue hardship or extreme inconvenience." The judge may also grant

# 1280

exemptions to five other categories of people, including those with mental or physical infirmities or those not proficient in the English language. After the judge has granted exemptions, the Clerk maintains the Qualified Jury Wheel.

The plan establishes four terms of court in each 12 months. Regular grand juries serve one term, while the term of special grand juries is determined by the designated judge but is not to exceed 18 months. Prior to each term, the Clerk randomly selects jurors for service from the Qualified Jury Wheel.

The plan also provides for temporary excuses for "undue hardship or extreme inconvenience," as well as for a maximum requirement of service.

This plan, based on random, proportional selection and clearly-articulated bases for exemption, does not appear especially susceptible to abuse. If the standard deviation of −3.298 can even be considered marginal, the plan used to select the indicting grand juries here manifests no discriminatory intent or unfair and unreasonable underrepresentation of a cognizable group due to systematic exclusion.

For the aforegoing reasons, the Court holds that the defendants have not established a prima facie case for violation of the fifth and sixth amendments or the Jury Selection and Service Act. Accordingly, defendants' motions to dismiss the indictments for sex discrimination in the selection of the grand jury members will be denied.

A separate order will be entered in this consolidated matter to confirm the rulings contained in this opinion.